**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

AMY LOCANE,

        Petitioner,

        v.

PATRICIA MCGILL, *et al.*,

        Respondents.

Civil Action No. 21-8888 (MAS)

**OPINION**

**SHIPP, District Judge**

This matter comes before the Court on Petitioner's petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Following an order to answer, Respondents filed a response to the Petition (ECF No. 6), to which Petitioner replied (ECF No. 8). For the following reasons, the Court denies the Petition and denies Petitioner a certificate of appealability.

## I.    BACKGROUND

In its opinion reversing Petitioner's sentence as overly lenient on direct appeal, the Superior Court of New Jersey, Appellate Division, summarized the factual background of Petitioner's conviction as follows:

> Tried by a jury, [Petitioner] was convicted of the lesser-included offense of second-degree vehicular homicide . . . and third-degree assault by auto[.] The trial judge, at the close of the trial, found her guilty of committing [several further motor vehicle offenses including driving while intoxicated, leaving the scene of an accident, and reckless driving]. [Petitioner] was convicted of two additional motor vehicle offenses committed in [another town]: drunken driving and reckless driving.

On February 14, 2013, the trial judge sentenced [Petitioner] as a third-degree offender on the second-degree crime, and imposed a three-year state prison term subject to the No Early Release Act (NERA)[.]  He also imposed a concurrent three-year term on the assault by auto.  The judge assessed [various applicable fines, fees, and driving privilege suspension penalties].  The State appealed the sentence; [Petitioner] cross-appealed her convictions and the imposition of [one of the penalties]. . . .

The following facts and circumstances are derived from the transcripts of the lengthy proceedings.  On the afternoon of June 27, 2010, [Petitioner], an actress, attended a cast party at which she was observed drinking both red and white wine.  At approximately 7:30 p.m., she drove to a barbecue at the home of friends, Caros and Rachel Sagbien.  [Petitioner]'s husband, accompanied by the party's three and one-half year old and seventeen-month-old children, was already there.  At the barbecue, [Petitioner] was seen tripping over her baby, spilling a glass of wine that she was holding, behaving flamboyantly, and using profanities despite the presence of other guests' children.  She slurred her words and seemed to have difficulty standing.  Between 8:30 and 9:00 p.m., [Petitioner] and her husband left in their separate vehicles.  The children traveled with their father.

Just after 9:00 p.m., [Petitioner] rear-ended a Honda Odyssey stopped at a red light at the intersection of Route 206 and Cherry Valley Road in Princeton Township.  The driver, Maureen Ruckelshaus, approached [Petitioner] to obtain her insurance information.  When [she] asked [Petitioner], who never left her vehicle, what had happened, she mumbled, "I, I guess I wasn't paying attention."   Ruckelshaus concluded [Petitioner] was intoxicated because of her slurred speech and glassy eyes.  Ruckelshaus, who did not have her cell phone with her, asked the driver of the car behind [Petitioner]'s SUV, Shantanu Deshpande, to call police because [Petitioner] was drunk.  Deshpande called 911 at 9:06 p.m.

While on the phone, Desphande watched Ruckelshaus attempt to remove what she presumed were [Petitioner]'s car keys from inside the driver's compartment.  Ruckelshaus then yelled "[y]ou're drunk" to [Petitioner].  When Ruckelshaus asked [Petitioner] to turn off her ignition and told her the police were on their way, [Petitioner] responded, "No, I'm good.  Don't worry about me[,]" and pulled around Ruckelshaus's Honda, forcing her to jump back to avoid being struck.  Deshpande witnessed Ruckelshaus jumping out of the way when [Petitioner] drove off.

2

Ruckelshaus followed [Petitioner], observing her driving erratically, tailgating the car in front of her and weaving from side to side as she attempted to pass in a no-passing zone. [Petitioner] alternated between speeding to pass and then abruptly dropping back. Attempting to get [Petitioner]'s attention, Ruckelshaus flashed her headlights and honked her horn.

Ruckelshaus followed [Petitioner] onto Cherry Hill Road, staying behind at least one car length. While swerving from side to side, and tailgating the car in front of her, [Petitioner] knocked down a mailbox. She drove on.

At the next intersection, while her right blinker was engaged, [Petitioner] turned left onto Cherry Valley Road and then made an immediate right back onto Cherry Hill Road and sped up. Ruckelshaus called out to the driver behind her, Perry Weitzner, to call police. Ruckelshaus was unable to follow, but watched as [Petitioner] sped away over an incline. When Ruckelshaus finally reached the top of the incline, she saw [Petitioner] approximately 800 or 900 feet ahead. She also saw the headlights of a car turning left into a driveway.

Without visibly swerving or braking, [Petitioner] drove her SUV into the passenger side of the vehicle, a silver Mercury Milan. The two cars spun apart, and the Milan struck a tree while [Petitioner]'s SUV came to rest partially in a ditch. Ruckelshaus stopped and ran towards the crash again calling to Weitzner to phone police. Ruckelshaus saw [Petitioner], who had a smile on her face, get out of her car, spin around, and fall back into the ditch.

Weitzner also saw [Petitioner] veering in and out of her lane across double yellow lines, speeding up and slowing down, and striking a mailbox. The vehicle's left blinker was engaged the entire time.

According to Weitzner, Ruckelshaus was following [Petitioner], honking her horn and intermittently flashing her lights. In his opinion, however, Ruckelshaus was not riding her bumper, although Weitzner conceded that he had previously stated that Ruckelshaus was staying "pretty close" to the SUV as though she were "riding" it. When [Petitioner] reached the stop sign at Cherry Valley Road, she stopped for an excessive amount of time before turning left. It was at this juncture that Ruckelshaus first yelled to him to call 911.

Weitzner saw [Petitioner]'s SUV disappear while Ruckelshaus was stopped at the stop sign. He drove behind

Ruckelshaus onto Cherry Valley Road but did not see the accident take place.

At trial, Ruckelshaus denied yelling at [Petitioner] or reaching into her car. She admitted refusing [Petitioner]'s offer to use her cell phone to call police. Ruckelshaus testified that she pursued [Petitioner] hoping to get her license plate number and to get her off the road. She honked her horn and flashed her lights a few times, but not all the way to Cherry Hill Road. She denied tailgating [Petitioner], insisting that she stayed back, concerned for her own safety.

The driver of the Milan was Fred Seeman.[] His passenger was his wife, Helene. When he got out of the vehicle, he asked Ruckelshaus for help, telling her, "I think my wife is dying."

Weitzner called 911 at 9:18 p.m., and police and paramedics promptly responded. After arriving, Montgomery Township Police Officer Christopher Bleistine approached [Petitioner], assuming that she was Fred's wife. She told him that she was "fine," had no injuries, and did not know why they were "making such a big deal out of this." Bleistine described [Petitioner], who smelled of alcohol, as talkative, laughing, and "very giddy."

Fred's wife Helene was pronounced dead at the scene, while Fred was airlifted in a Medivac helicopter and taken to the Robert Wood Johnson University Hospital Trauma Center. He was informed of his wife's death during the trip.

[Petitioner] gave her name and address to Officer Jason Clifford and told him that her identification was in her purse in the car. She also told him she had consumed four glasses of wine and asked him to check whether her children were in the car. According to Clifford, [Petitioner] responded promptly to his questions and seemed alert. Her speech was slurred, her eyes were watery, and she was laughing and giggling.

Ali Larcombe, an EMT called to the scene, agreed that [Petitioner]'s speech was slurred even though she correctly answered basic questions. [Petitioner] reported that she had not been thrown from her vehicle because she was wearing her seatbelt and had never lost consciousness. She did not answer when Larcombe asked her if she remembered the accident. [Petitioner] acknowledged having drunk some wine but was able to stand up and step out of the ditch unassisted.

Officer William Wilkes, who traveled in the ambulance with [Petitioner], recalled that she insisted that she did not need a neck brace. She did not appear to understand the circumstances, and said everyone was being over-dramatic. [Petitioner] was friendly, talkative, and laughed a great deal. She explained that she had been coming from Hopewell and had consumed four glasses of wine and a beer. When Wilkes told her she had been in a serious car accident, she responded, "God bless America I wasn't hurt" and laughed. Wilkes said a second car was involved, but [Petitioner] did not ask about the occupants.

Larcombe and a second EMT, Peter Jozwick, both traveled in the ambulance with [Petitioner] and Wilkes. Jozwick also remembered [Petitioner] appeared alert and spoke continuously while giggling and laughing. Her eyes were glassy and her speech a little slurred at times.

[Petitioner] did not complain of pain and repeatedly asked to return to her car and go home. She did not mention being followed by anyone before the crash. Eventually [Petitioner] asked whether anyone was hurt, but when no one answered, continued laughing and repeating herself.

[Testimony from medical staff at the hospital further confirmed that Petitioner appeared intoxicated and unaware of the full details of the accident, and that blood tests ultimately revealed Petitioner was well over the legal limit for drunk driving with a BAC of between .2679 and .269% at 10:48 p.m.]

At 11:50 p.m., Somerset County Prosecutor's Office Detective Michael Schutta arrived at the hospital to interview [Petitioner]. In the next eighteen minutes, she waived her *Miranda*[] rights and was questioned.

On tape, [Petitioner] confirmed that she was in Princeton Medical Center, provided her address, date of birth, and social security number. She denied remembering being in an accident; however, she recalled taking Zoloft that morning, acting in a play that day, taking down the set with others in the cast, going to a barbecue, being bored and wanting to leave, and eventually driving away in her SUV.

[Petitioner] made a number of contradictory statements regarding her alcohol consumption: (1) that she had two glasses of wine during her performance or none at all; (2) had a glass of wine after striking the set; (3) had two or three glasses of wine after striking the set, plus some beer; (4) had two or three glasses of wine

at the barbecue; (5) had one or two glasses of wine after dinner; and (6) "maybe" had an unspecified amount of wine at the barbecue.

[Petitioner] denied mixing Zoloft and wine. She claimed she was "conservative" in her drinking because she knew she would probably have to drive her daughters home after the barbecue. [Petitioner] did not recall being involved in any collisions that night but added that, "[a]s far as [she] was concerned[,] [her] girls were not in . . . the back seat so . . . [w]hat the [expletive] [did] [she] care."

Schutta observed that [Petitioner]'s eyes were bloodshot, her hair disheveled, her speech "somewhat" slurred, and that she smelled of alcohol. After taking her statement, Schutta advised [Petitioner] of the charges against her. She was released into police custody at 1:24 a.m. Three days later, she sought medical attention for three broken toes on her left foot and one, perhaps two, rib fractures.

*State v. Locane*, 2016 WL 3943370, at *1-6 (N.J. App. Div. Feb. 24, 2016.)

Further evidence indicated that Petitioner's surviving victim, Fred, suffered seven rib fractures, contusions and bruising of the lungs, and a punctured lung which carried a substantial risk of death and resulted in months of recovery, while his wife had suffered severe blunt force trauma resulting in numerous injuries and her likely immediate death as a result of significant brain and spinal damage. *Id.* at *6-7. Evidence from the scene further indicated that Petitioner should have seen Fred's headlights after cresting a hill shortly before the crash, but there was no evidence that she tried to brake prior to the collision. *Id.* Petitioner's own car records indicated that she neither braked nor sped up prior to the crash and was traveling at a steady fifty-three miles per hour just prior to the crash. *Id.* at *7-8.

Following Petitioner's sentence, the state appealed, and Petitioner cross-appealed, attacking her conviction. Only the state's appeal is relevant to this habeas matter. The Appellate Division agreed with the State that the sentence imposed was improperly lenient in light of the circumstances and remanded for a resentencing as the trial court judge had failed to comply with mandatory state law provisions relevant to the sentencing and failed to give proper weight to the

severity of Petitioner's offense. *Id.* at *20-22. The Appellate Division in the initial opinion, other than requiring the judge on remand to comply with state law, took "no position regarding any new sentence." *Id.* at *22.

    The Appellate Division described what occurred on remand as follows:

> The trial judge understood the remand as requiring him only to more fully explain his reasons for the sentence. He supported this view by citing to the portion of our decision in which we said, as appellate courts often do, that we took no position with regard to any new sentence he might impose. In reiterating the same perspective he expressed during the first sentencing proceeding, the judge disregarded our extensive discussion regarding the legal standard for a downgrade. As he did at the initial sentencing hearing, the judge on remand focused on the personal circumstances particular to this [Petitioner] and not the severity of the crimes she had committed.

> After explaining that [the Supreme Court's intervening decision in *Alleyne v. United States*, 570 U.S. 99 (2013)] prevented the imposition of a parole bar on the second-degree offense and mandated the reduction of the third-degree assault to a fourth-degree offense, the judge added "[t]he purpose of sentencing law starts with the proposition that our [s]tatutes address correction and rehabilitation of offenders, differentiation among offenders, with a view toward individualization, and justness in their treatment."

> The judge again gave slight weight to [aggravating factors including the severity of the offense] . . . [and] again downgraded the vehicular homicide from a second-degree offense to a third-degree crime, imposing the lowest possible term of imprisonment within that range. He sentenced [Petitioner] to <u>precisely</u> the same term on the vehicular homicide—a three-year term of imprisonment—with an eighteen-month sentence on the now fourth-degree assault by auto.

*State v. Locane*, 454 N.J. Super. 98, 113-15 (App. Div. 2018).

    Before reaching the State's appeal of this new sentence, the Appellate Division turned to Petitioner's argument that an increased sentence would violate her rights under the Double Jeopardy Clause of the Constitution. The Appellate Division rejected that claim, explaining as follows:

The Double Jeopardy Clauses of the federal and state constitutions prohibit multiple punishments for the same offense, and any increase in sentence after the service of the sentence has begun. U.S. Const. amend. V; N.J. Const. art. 1 ¶ 11. However, the protection does not apply if defendant did not have an expectation of finality. *State v. Roth*, 95 N.J. 334, 344 [(1984)] (adopting the test set forth in *United States v. DiFrancesco*, 449 U.S. 117, 133 [] (1980)).

A defendant has no expectation of finality in a sentence when the State exercises a statutory right to appeal or when the sentence is illegal. *Ibid.*; *State v. Sanders*, 107 N.J. 609, 619-21 . . . (1987). . . .

[Petitioner]'s downgraded sentence is not illegal per se because it is an authorized disposition [under state law]. That the analysis was incorrectly conducted does not make it illegal, because it does not stray outside the boundaries of third-degree offenses.

The State's right to challenge the downgrade stems from [N.J. Stat. Ann.] § 2C:44-1(f)(2). That statute provides that when a sentencing court downgrades a first or second degree offense, the "sentence shall not become final for 10 days in order to permit the appeal of such sentence by the prosecution." The State appealed within that window. The constitutionality of that provision is long-established. *Roth*, 95 N.J. at 345[.]

Pursuant to Rule 2:9-3(d), upon the State's filing of a notice of appeal, "execution of the sentence shall be stayed pending appeal," but the "defendant may elect to execute a sentence stayed by the State's appeal." If the defendant elects to begin service of the sentence pending appeal, "such election shall constitute a waiver of the right to challenge any sentence on the ground that execution has commenced." *Ibid.*; *see also Sanders*, 107 N.J. at 620[] (a defendant has no expectation of finality in a lenient sentence that the State has appealed, and thus, reversal of the sentence does not offend double jeopardy principles); *State v. Eigenmann*, 280 N.J. Super. 331, 336 (App. Div. 1995) (a defendant waives a double jeopardy challenge if the defendant serves the sentence despite the imposition of a stay pursuant to Rule 2:9-3(d)).

Here, the State exercised its right to appeal the downgrade initially imposed and obtained a stay of the sentence. [Petitioner] nonetheless chose to serve her sentence despite the stay. She completed eighty-five percent of her three-year prison term prior to our direct appeal decision, and was released on June 12, 2015. On that date, she began three years of parole supervision. On remand, the trial judge again downgraded the second-degree conviction. The

State obtained a stay and filed a notice of appeal challenging the sentence. [Petitioner] continued on parole supervision.

Because [Petitioner] turned herself in before she was sentenced, and never sought release pending appeal, she has waived the right to challenge any increase on remand. [N.J. Ct. R.] 2:9-3(d). The waiver applies not only to the initial appeal, but to this appeal as well.

[Petitioner] has always known that her sentence was subject to correction; she had no reasonable expectation of finality in her sentence. . . . Therefore, vacating her downgraded sentence does not offend principles of double jeopardy.

Nor is [Petitioner] protected by double jeopardy considerations from a harsher sentence on remand. [Petitioner] waived the double jeopardy challenge by choosing to serve her sentence despite the stay. . . . Additionally, parole supervision means she is still serving her sentence.

As we explained [in other cases], while the double jeopardy clause protects against multiple punishments for the same offense [it does not permit a defendant to retain a lesser sentence mistakenly imposed contrary to law].

As an alternative ground prohibiting a sentence increase on remand, [Petitioner] contends that additional prison time will "clearly violate[] her fundamental fairness right to be free from egregious official oppression and harassment[]" given the length of time that has passed since the crime and her release from prison. She also underscores the trial judge's finding that there is no need to deter her, and that her children may suffer permanent and serious psychological harm if she is again separated from them.

. . .

[State caselaw requiring a dismissal based on delay based on fundamental fairness], however, does not apply here. The State has twice had to timely challenge an unsupported downgrade. The challenge had merit in the first appeal, and continues to have merit today. The length of time that has passed since the crimes and [Petitioner]'s release from prison is a result of the inevitable delays inherent in the process. It is not the effect of some arguably oppressive state action against a citizen. . . .

In this case, a third sentence hearing is legally necessary. It is necessary for the public interest and the victims' right to be

> figured into the sentencing equation.   In sum, neither double
> jeopardy nor notions of due process and fundamental fairness
> preclude the State's downgrade challenge in this appeal.

*Locane*, 454 N.J. Super. at 116-20.  Because the trial judge had essentially reiterated the same

errors that mandated the reversal of Petitioner's initial sentence, the Appellate Division once again

remanded for a resentencing, this time before an entirely new judge in the trial court. *Id.* at 120-31.

Petitioner was once again resentenced, this time to a five year prison term, by a new trial

court judge. *See State v. Locane*, 2020 WL 4206727, at *1.  In so doing, however, the trial court

judge appeared to criticize the two prior Appellate Division decisions and "employed a

[sentencing] methodology all his own" based on the judge's views of the "yin and yang" of

sentencing rather than the provisions and requirements of New Jersey state law.   *Id.* at *1-4.

Although this judge imposed an increased sentence, he repeated many of the same state law errors

of the first judge.   *Id.*   The State once again appealed, and the Appellate Division once again

vacated the sentence and remanded for a new sentence before an entirely new trial judge given the

second judge's extreme variation from state law sentencing principles.  *Id.* at *4-14.  In so doing,

the Appellate Division again rejected Petitioner's double jeopardy arguments for largely the same

reasons – she had no expectation of finality given the downgraded sentence and the state's right to

appeal and timely notice of appeal, and had waived her challenge as she was clearly aware of the

risk of an increased sentence but chose not to seek release from prison pending appeal and instead

served her sentence pending appeal of her own volition.  *Id.* at *4-8.  The Appellate Division

further found that the "record does not support [Petitioner's] contention that she was not given the

option of remaining free on bail." *Id.* at *8.

Petitioner returned for her fourth sentencing on September 17, 2020.  *See State v. Locane*,

2022 WL 1320326, at *1 (N.J. App. Div. May 3, 2022).  Following that sentencing, the judge

imposed an eight year term, subject to NERA, on the vehicular homicide conviction, and

reimposed the concurrent eighteen-month sentence on the assault by auto offense.  *Id.*  Following the sentence, Petitioner sought to have her new sentence vacated on grounds that her sentencing attorney had represented the sentencing judge's niece in an unrelated case, but that request was denied.  *Id.*  Petitioner appealed her sentence.  *Id.*  On appeal, the Appellate Division affirmed the newly issued sentence as appropriate and proper under state law, and as the sentencing judge had followed proper procedure in issuing the sentence.  *Id.* at *4-6.  The Appellate Division also rejected a challenge to the reimposed eighteen-month concurrent term on the assault by auto charge on double jeopardy grounds.  The Appellate Division stated that the reimposed sentence was no different than that previously imposed, and the sentencing judge found the reimposed term already satisfied but necessary for the purposes of entering a complete and accurate judgment of conviction.  In addition, Petitioner was not prejudiced.  *Id.*  Petitioner did not explicitly reraise her previous double jeopardy arguments.  *Id.*  The Appellate Division also rejected a challenge to the sentencing judge's alleged conflict, finding no appearance of impropriety under the circumstances. *Id.*

## II.      **LEGAL STANDARD**

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that [she] is in custody in violation of the Constitution or laws or treaties of the United States."  A habeas petitioner has the burden of establishing [her] entitlement to relief for each claim presented in [her] petition based upon the record that was before the state court.  *See Eley v. Erickson*, 712 F.3d 837, 846-47 (3d Cir. 2013).  Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts.  *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta[,]" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III.    <u>DISCUSSION</u>

In her habeas petition, Petitioner raises various claims related to her rights under the Double Jeopardy Clause and the findings of waiver of those rights by the state courts, which she believes render her increased sentences unconstitutional. The basic premise underlying each of these arguments is Petitioner's belief that the Double Jeopardy Clause attached to protect her from an increased sentence on remand because she served her improper sentence during the appeal and resentencing processes, notwithstanding the State's timely appeals of her sentences. Petitioner is mistaken.

As the Supreme Court has explained, while the Double Jeopardy Clause protects individuals from retrial following an acquittal and in similar circumstances where the conclusion of criminal proceedings results in a reasonable expectation of finality, a non-capital sentencing procedure "does not 'have the qualities of constitutional finality that attend an acquittal.'" *Monge v. California*, 524 U.S. 721, 729 (1998) (quoting *United States v. DiFrancesco*, 449 U.S. 117, 134 (1980)). The Double Jeopardy Clause therefore does not "prevent[] the prosecution from seeking review of a sentence." *Id.* Where a statute authorizes a government appeal under the circumstances, a criminal defendant "is charged with knowledge of the statute and its appeal provisions, and has no expectation of finality in [her] sentence until the appeal is concluded or the time to appeal has expired." *Wilmer v. Johnson*, 30 F.3d 451, 457 (3d Cir. 1994) (quoting *DiFrancesco*, 449 U.S. at 136). Indeed, this expectation of finality will not attach, and the Clause will not bar a resentencing, even where a remand proceeding will require further evidentiary sentencing proceedings outside of the capital context where state law provides for an appeal by the prosecution. *Id.* at 457-58. Thus, where a state statute provides for a sentencing appeal by the prosecution, the Double Jeopardy Clause will not bar a resentencing following a successful appeal by the prosecution in the non-capital context at issue here.

Petitioner argues that her case is an exception because she served both her original prison sentence and supervised release term before her most recent resentencing.[1] The Supreme Court of the United States has never issued such a ruling in the non-capital context, but the Third Circuit

---

[1] This argument is, to some extent, misleading. Petitioner had not completed her initial sentence prior to the filing of notices of appeal in each of her first two appeals. Although she had completed her initial, improper sentence by the time of her third sentencing, that sentence was vacated, and the new, now incomplete five year sentence took its place prior to the State's final appeal, and was in any event stayed pending appeal. It is thus clear that none of the sentences Petitioner received was ever truly "final" or complete at the time the notices of appeal were filed, and Petitioner is trying to use the length of the appellate process to gain a windfall and avoid a proper sentence under state law.

has held that a defendant's rights "may be violated when a sentence is enhanced after the defendant has served so much of [her] sentence that [her] expectations as to its finality have crystallized and it would be fundamentally unfair to defeat them." *United States v. Davis*, 112 F.3d 118, 123 (3d Cir. 1997). Even in such a context, however, "[i]t is only in an extreme case that a later upward revision of a sentence is so unfair that it is inconsistent with the fundamental notions of fairness found in the due process clause." *Id.* In determining whether such an extreme case is presented in the context of a resentencing following a successful collateral attack on a conviction and sentence long after the time for a direct appeal had ended, the Third Circuit looked to three factors: whether the defendant challenged his conviction or sentence, whether the prison sentence has been completely discharged, and whether the aggregate sentence is ultimately increased. *Id.* at 123-24. The context of that holding—a resentencing in a habeas proceeding long after direct appeals had ended—is substantially different from the one presented in this matter. *See id.* Petitioner at no point had a true expectation of finality in her sentence as the State appealed each of the first three sentences within days of their issuance and well within the statutory time period, unlike a petitioner who is resentenced long after any direct appeal concluded and following collateral proceedings.

Even if this case and similar circuit precedent elsewhere did more directly support Petitioner's contentions, however, it would be of no moment in this habeas proceeding as only clearly established federal law—that which is contained in the holdings of Supreme Court opinions—is relevant in the habeas context. *Woods*, 575 U.S. at 316. The clearly established law on this issue is therefore the holdings of cases such as *DiFrancesco* and *Monge*, which clearly stand for the proposition that the Double Jeopardy Clause has no application to bar increased sentences following a successful, legally authorized and timely government appeal of an excessively lenient sentence in a non-capital criminal case. *See Monge*, 524 U.S. at 729. Because clearly established federal law does not support a double jeopardy claim such as the one Petitioner

14

seeks to make, the Appellate Division's rejection of her double jeopardy claims is neither contrary to nor an unreasonable application of federal law.

Seeking to escape this conclusion, Petitioner attempts to reframe her claims as based on an improper finding that she waived her sentence by serving the sentence pending the State's initial appeal, importing caselaw unrelated to the double jeopardy context regarding waiver of other criminal rights. Although Petitioner attempts to shift the blame for her serving the sentence onto the State or state court judges for failing to fully ensure she knew she could seek release pending appeal, in so doing she ignores the Supreme Court's proscription that a criminal defendant "is charged with knowledge of [the applicable] statute and its appeal provisions, and has no expectation of finality in [her] sentence until the appeal is concluded or the time to appeal has expired." *Wilmer*, 30 F.3d at 457 (quoting *DiFrancesco*, 449 U.S. at 136). Clearly established federal law thus placed the onus on Petitioner to be aware of her rights under the applicable laws permitting a state appeal, and thus Petitioner was required to request a stay of sentence or release pending appeal to the extent she did not wish to waive any right, an action Petitioner acknowledges she did not take.[2] Regardless, the waiver issue is a red herring as it relates to waiver of Petitioner's double jeopardy rights. As the Appellate Division found, in harmony with binding Supreme Court precedent, that Petitioner had no right under the clause which was impugned by the State's appeals and her resentencing, it necessarily follows that whether she waived that right is immaterial. The

---

[2] Petitioner attempts to argue that the state courts' finding that she voluntarily reported to jail and chose not to seek bail during appeal amounts to unreasonable applications of the facts, but in her reply acknowledges that she did decide not to pursue bail pending appeal because she and her attorney thought such a motion would be unsuccessful. Regardless of Petitioner's beliefs as to the result of such a motion had it been made, she acknowledges that a motion could have been filed and was not, which supports the conclusion that she voluntarily served her sentence rather than choosing to pursue bail during an appeal. Petitioner has thus not shown by clear and convincing evidence that the state courts' factual findings were erroneous, and has failed to show that the courts' decisions were contrary to or unreasonably applied relevant facts.

Appellate Division's waiver decision was neither contrary to nor an unreasonable application of clearly established federal law, and Petitioner has thus failed to show an entitlement to habeas relief.  Petitioner's habeas petition is therefore denied.[3]

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of [her] state court conviction unless [she] has "made a substantial showing of the denial of a constitutional right."  "[A petitioner] satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of [her] constitutional claims or that jurists could conclude [that] the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Because Petitioner's habeas claims are without merit for the reasons set forth above, she has failed to make a substantial showing of a denial of a constitutional right, and her petition is not adequate to receive encouragement to proceed further.  This Court therefore denies Petitioner a certificate of appealability.

## V.   CONCLUSION

In conclusion, Petitioner's habeas petition (ECF No. 1) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability.  An appropriate order follows.

*Masshipp*

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

---

[3] In their answer, Respondents argue that Petitioner's habeas claim contains a number of additional, unexhausted ineffective assistance and related claims buried in her factual background and lurking in the wings of her arguments.  Petitioner's reply, however, makes it clear that she is seeking to raise no such claim, and is solely attacking her sentence on double jeopardy and waiver of double jeopardy grounds.  This Court thus does not construe any additional claims and need not address whether these lurking claims would be exhausted had Petitioner tried to raise them.